| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**SOUTHERN DISTRICT OF NEW YORK**<br>------------------------------------------------------------X<br>**WINNIE SABBAT,**<br><br>                    Plaintiff,<br><br>   -against-<br><br>**COLORSxSTUDIOS, INC.,**<br>**COLORSxSTUDIOS GMBH,** and<br>**JONAS WEBER.**<br><br>                    Defendants,<br><br>------------------------------------------------------------X | Civil Action No.: 1:25-cv-5819<br>Date Filed: July 15, 2025<br><br><br><br><br><br><br><br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

NOW COMES Plaintiff Winne Sabbat ("Plaintiff") and proffers this Complaint for damages against Defendants COLORSxSTUDIOS, INC., COLORSxSTUDIOS GMBH, and JONAS WEBER (collectively "Defendants") as follows:

## NATURE OF THE ACTION

1. This action is brought by Plaintiff pursuant to the New York State Executive Law ("NYSHRL") and the New York City Administrative Code ("NYCHRL") to redress violations of these laws. Specifically, Plaintiff was discriminated against on the basis of her gender, subjected to *quid pro quo* sexual harassment and a hostile work environment, and retaliated against, among other things.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c), because Defendant's conduct business in this judicial District, and substantial parts of the acts and/or omissions giving rise to the claims herein alleged occurred in this judicial District.

## THE PARTIES

4. Plaintiff Winnie Sabbat is a female and a resident of New York, New York.

5. Defendant COLORSxSTUDIOS, Inc. is a Delaware Corporation, which is authorized to and which does conduct business in the State of New York.

6. Defendant COLORSxSTUDIOS GMBH is a foreign corporation authorized to conduct business in Germany.

7. Defendants COLORSxSTUDIOS, Inc. and COLORSxSTUDIO GMBH (collectively referred to hereafter as "COLORS"), operate as one unified company across both the Germany and United States entities, sharing leadership, centralized decision-making, and integrated operations.

8. COLORS is an online music performance platform that aims at introducing and showcasing emerging artists.

9. Defendant Jonas Weber is a male and a citizen of the country of Germany.

10. At all times relevant herein, Defendant Weber serves as the Chief Executive Officer for COLORS.

11. At all times relevant herein, Plaintiff was an "employee" of Defendants' as that term is defined by the NYSHRL and NYCHRL.

12. At all times relevant herein, Plaintiff performed her job duties for Defendants remotely from her home in New York, NY.

13. At all times relevant herein, Defendants were jointly Plaintiff's "employer" as that term is defined by the NYSHRL and NYCHRL.

## STATEMENT OF FACTS

14. Plaintiff began working for Defendant COLORS in or around August 2023. Plaintiff served as a Consultant to Defendant Weber, CEO.

15. Thereafter, because of Plaintiff's excellent performance, Defendants offered her fulltime employment with COLORS. Additionally, Plaintiff was offered a seat on the Board of Directors for COLORS.

16. Plaintiff accepted the Board appointment, effective January 1, 2024.

17. Plaintiff also accepted the offer for fulltime employment. She began serving as COLORS' Chief Financial Officer, effective on or about April 15, 2024.

18. In this role, Plaintiff's responsibilities included investor relations, overseeing the finance team, budgeting, forecasting, and supporting executive decision-making.

19. Plaintiff reported to CEO, Defendant Weber. Given the nature of Plaintiff's role, she was required to work closely with Defendant Weber.

20. Throughout late 2024, Defendant Weber and Plaintiff engaged in flirtatious dialogue via text message and through voice memos. On several occasions during which Defendant Weber visited the United States, he and Plaintiff held hands.

21. During this time, Plaintiff began to develop romantic feelings for Defendant Weber. In or around January 2024, Plaintiff informed Defendant Weber of these feelings and she asked if he was interested in exploring a relationship with her.

22. Defendant Weber declined, noting that he believed it would complicate their working dynamic.

23. Plaintiff accepted this and agreed that from that point forward, their relationship would remain professional. To ensure this occurred, Plaintiff met with Defendant Weber to set professional boundaries.

24. Specifically, in January 2024, Plaintiff requested that they agree to keep their communications on company channels, i.e., through email, slack, and in-person business meetings. Further, Plaintiff requested that they limit their discussion to business-related matters and avoid discussion related to their personal lives.

25. To Plaintiff's surprise, Defendant Weber was upset with this proposal and indicated that this did not work for him because he needed continued access to Plaintiff.

26. In an attempt to compromise while maintaining a professional boundary, Plaintiff suggested that she and Defendant Weber could meet twice a week to discuss all business-related matters. That would alleviate the need for Defendant Weber to remain in constant communication with Plaintiff via text message and voice memos. Defendant Weber agreed to this.

27. However, it quickly became clear to Plaintiff that Defendant Weber had no intention of honoring Plaintiff's boundaries as agreed upon.

28. Instead, Defendant Weber spent the next several months crossing the boundaries set by Plaintiff, making unwanted sexually-based advances, and sexually harassing her.

29. By way of example only, Defendant Weber regularly texted Plaintiff throughout the next month to tell her good morning and that he missed her.

30. In March 2024, Plaintiff traveled to Berlin, Germany to attend several work-related meetings. During these meetings, Defendant Weber sat next to Plaintiff. On several occasions, Defendant Weber placed his hand on Plaintiff's upper thigh.

31. Plaintiff flinched and moved her leg away from Defendant Weber's grip. However, he did not stop the unwanted touching. Instead, Defendant Weber moved closer to Plaintiff and continued to touch her upper thigh.

32. During a separate business trip to Paris, France in April 2024, Defendant Weber became visibly angry when a taxi driver began flirting with Plaintiff.

33. When the taxi driver asked Plaintiff on a date, Defendant Weber interrupted the conversation, raised his voice to question Plaintiff's motives, then played music loudly to ensure Plaintiff could no longer converse with the taxi driver.

34. Despite clear rejections of Defendant Weber's advances, his attempts to cross the professional boundaries Plaintiff set persisted.

35. For instance, Defendant Weber informed Plaintiff that he needed to rely on her for emotional support during a challenge family health situation, and he asked if he could start texting her regularly again. Plaintiff declined.

36. On Plaintiff's birthday, Defendant Weber sent her flowers and champagne.

37. Defendant Weber also requested an invitation to Plaintiff's apartment on several instances when he visited New York, citing the need to meet with Plaintiff for business-related reasons.

38. Plaintiff attempted to redirect Defendant Weber to adhere to the professional boundaries they had agreed upon. However, Defendant Weber was persistent.

39. On May 2, 2024, Defendant Weber insisted that he come to Plaintiff's apartment before his flight back to Germany. At Defendant Weber's request, Plaintiff reluctantly agreed to cook him dinner.

40. During the dinner, Defendant Weber again pushed Plaintiff's boundaries, attempting to focus the discussion on Plaintiff's personal life and away from COLORS-related matters.

41. In an apparent attempt to influence Plaintiff to acquiesce with his persistent boundary-crossing, Defendant Weber reminded Plaintiff how "well connected" he was when discussing Plaintiff's aspirations about her venture capital fund.

42. Later in May 2024, Defendant Weber again engaged in unwanted sexually-based touching of Plaintiff when he massaged her neck during an investor meeting.

43. In June 2024, Defendant Weber informed Plaintiff that he was returning to the United States and that the two of them would be spending time together.

44. During this trip, Plaintiff had to go out of her way to avoid interacting with Defendant Weber one-on-one. She attempted to remove herself from these situations, requiring that the two of them meet only during business hours for business-related reasons.

45. On or about July 28, 2024, Plaintiff mentioned that she really liked COLORS' newly hired male employee. Defendant Weber became angry and accused Plaintiff of being "into" the new employee and suggesting that the two could become romantically involved.

46. Plaintiff was deeply disturbed by Defendant Weber's behavior and it began to cause her significant distress and interfere with her work.

47. Having reached her breaking point, Plaintiff decided to confront Defendant Weber about his actions.

48. Specifically, Plaintiff informed Defendant Weber that she sensed he was frustrated with her and wanted to figure out how the two of them could move past this.

49. The next day, on or about July 28, 2024, Plaintiff sent Defendant Weber a voice memo outlining the concerns she had with his behavior and his persistent crossing of the professional boundaries she had set.

50. Defendant Weber replied to Plaintiff's message, stating—among other things—that he respected her decision to draw a line, but that this could not impact their professional relationship.

51. Defendant Weber further stated that he appreciated Plaintiff raising these concerns to him, and that he was committed to attending management coaching to work on himself.

52. However, Plaintiff's work environment did not improve. Instead, the sexually-based unwanted advances continued.

53. In or around August 2024, while attending a meeting in New York, Defendant Weber insisted that Plaintiff sit directly next to him on a couch. He demanded that she move closer so that they were touching. Again, Plaintiff refused Defendant Weber's advances.

54. Thereafter, Defendant Weber began to undertake a plan to push Plaintiff out of the organization in response to her refusal to give in to his advances.

55. In or around mid-August 2024, Defendant Weber hired a leadership coach for COLORS' management team. However, Plaintiff was excluded from the meetings and not permitted to participate.

56. In September 2024, Defendant Weber and COLORS' Chief of Staff planned an investor's meeting for the only time that particular day that Plaintiff indicated she would not be available to attend.

57. Throughout the next several months, Defendant Weber, along with COLORS' management, intentionally undermined Plaintiff, effectively stripping away her responsibilities.

58. For example, rather than permitting Plaintiff to issue discipline to a subordinate who was not adequately performing her job, COLORS' management blamed Plaintiff.

59. Defendant Weber specifically blamed Plaintiff for the performance breakdown and questioned her leadership abilities.

60. On or about October 11, 2024, Plaintiff met with Defendant Weber for the purpose of what she believed would be a business meeting.

61. However, upon arriving, Defendant Weber refused to discuss the topic at issue. Instead, he asked Plaintiff personal questions about her family. Further, Defendant Weber insisted that he sit directly next to Plaintiff, touching her and giving her very little room, while staring at her breasts.

62. Defendant Weber then stated that he did not come "all this way" to sit outside and talk to Plaintiff. Instead, he came all this way to be in her apartment.

63. When Plaintiff declined to allow him to come to her apartment, Defendant Weber became upset and left.

64. Throughout October 2024, Defendant Weber continued to undermine Plaintiff and created roadblocks, making it extremely difficult for Plaintiff to effectively perform her job duties.

65. Unable to continue working in these conditions, Plaintiff again confronted Defendant Weber about his behavior on or about November 6, 2024.

66. Plaintiff stated that she believed Defendant Weber and COLORS were setting her up for failure and that she felt she was being retaliated against.

67. Rather than rectifying the issue or proposing a viable path forward, Defendant Weber accused Plaintiff of being a "bad leader" and failing to do her job.

68. As a way to move past this, Defendant Weber proposed that the two of them meet and "spend time together" when he returned to New York.

69. It became clear to Plaintiff that her continued successful employment with COLORS would depend on her willingness to give into Defendant Weber's requests, such as "spending time together."

70. Thus, having no other option, Plaintiff decided to propose a transition plan. Under Plaintiff's plan, she would continue to serve as the CFO until COLORS found a replacement. Even once her fulltime employment ended, she intended to remain a member of COLORS' Board of Directors.

71. Plaintiff relayed this proposal to Defendant Weber on or about November 18, 2024. In response, Defendant Weber became angry and terminated Plaintiff.

72. On December 11, 2024, COLORS sent Plaintiff "off-boarding" documentation, including a "Termination Letter of US Employment" and "Confirmation of Termination and Retention of VSOP Shares."

73. Following the termination of her employment, COLORS then retroactively requested that Plaintiff execute a resignation letter, which she refused to do.

## FIRST CAUSE OF ACTION
### Violation of NYSHRL
### Gender/Sex Discrimination

74. All of the preceding paragraphs are realleged as if fully rewritten herein.

75. By the actions described herein, among others, Defendants violated the New York State Executive Law, § 296 by discriminating against Plaintiff on the basis of her sex/gender, subjecting her to sexual harassment, forcing her to work in a hostile work environment, and/or by otherwise discriminating against her in the terms, privileges and conditions of her employment.

76. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

### SECOND CAUSE OF ACTION
### Violation of NYSHRL
### Hostile Work Environment - Sexual Harassment

77. All of the preceding paragraphs are realleged as if fully rewritten herein.

78. Defendants created a hostile work environment for Plaintiff due to Defendant Weber's unwanted sexual harassment, advances, and unwanted touching.

79. COLORS knew or should have known of Defendant Weber's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

80. COLORS created, enabled, and maintained a sexually hostile work environment.

81. A reasonable woman would conder that she was being treated less well that other employees under the circumstances. Plaintiff actually believed that she was being treated less well than other employees because of her gender.

82. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

83. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

## THIRD CAUSE OF ACTION
### Violation of NYSHRL
### Quid Pro Quo - Sexual Harassment

84. All of the preceding paragraphs are realleged as if fully rewritten herein.

85. Plaintiff was subjected to unwelcome sexual harassment, advances, and unwanted touching by Defendant Weber, with the implication that unless she submitted to his sexual advances, she could not expect to enjoy a successful career with COLORS.

86. Plaintiff rejected the unwelcome sexually-based advances by her supervisor, Defendant Weber, who had the power to alter the terms and conditions of Plaintiff's employment.

87. Plaintiff's rejection of Defendant Weber's advances was used as the basis for decisions affecting the compensation, terms, conditions, and/or privileges of Plaintiff's employment with COLORS.

88. COLORS knew or should have known of Defendant Weber's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

89. COLORS created, enabled, and maintained a sexually hostile work environment.

90. A reasonable woman would conder that she was being treated less well that other employees under the circumstances. Plaintiff actually believed that she was being treated less well than other employees because of her gender.

91. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

92. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

11

**FOURTH CAUSE OF ACTION**
**Violation of NYSHRL**
**Retaliation**

93. All of the preceding paragraphs are realleged as if fully rewritten herein.

94. By the actions described herein, among others, Defendants violated the New York State Executive Law, Section 296(7) when they retaliated against Plaintiff by terminating her employment or by otherwise discriminating against her in the terms, privileges and conditions of her employment, because she opposed the unlawful discrimination and harassment from Defendant Weber.

95. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

**FIFTH CAUSE OF ACTION**
**Violation of NYCHRL**
**Gender/Sex Discrimination**

96. All of the preceding paragraphs are realleged as if fully rewritten herein.

97. By the actions described herein, among others, Defendants violated the N.Y.C. Amin. Code Title 8-107 by discriminating against Plaintiff on the basis of her sex/gender, subjecting her to sexual harassment, forcing her to work in a hostile work environment, and/or by otherwise discriminating against her in the terms, privileges and conditions of her employment.

98. As a direct and proximate result of the unlawful conduct, Plaintiff has suffered severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

99. Defendants committed these unlawful acts with willful negligence, or reckless or a conscious disregard, of Plaintiff's right for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Violation of NYCHRL
### Hostile Work Environment – Sexual Harassment

100. All of the preceding paragraphs are realleged as if fully rewritten herein.

101. Defendants created a hostile work environment for Plaintiff due to Defendant Weber's unwanted sexual harassment, advances, and unwanted touching.

102. COLORS knew or should have known of Defendant Weber's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

103. COLORS created, enabled, and maintained a sexually hostile work environment.

104. A reasonable woman would conder that she was being treated less well that other employees under the circumstances. Plaintiff actually believed that she was being treated less well than other employees because of her gender.

105. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

106. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

107. Defendants committed these unlawful acts with willful negligence, or reckless or a conscious disregard, of Plaintiff's right for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
## Violation of NYCHRL
## Quid Pro Quo – Sexual Harassment

108. All of the preceding paragraphs are realleged as if fully rewritten herein.

109. Plaintiff was subjected to unwelcome sexual harassment, advances, and unwanted touching by Defendant Weber, with the implication that unless she submitted to his sexual advances, she could not expect to enjoy a successful career with COLORS.

110. Plaintiff rejected the unwelcome sexually-based advances by her supervisor, Defendant Weber, who had the power to alter the terms and conditions of Plaintiff's employment.

111. Plaintiff's rejection of Defendant Weber's advances was used as the basis for decisions affecting the compensation, terms, conditions, and/or privileges of Plaintiff's employment with COLORS.

112. COLORS knew or should have known of Defendant Weber's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

113. COLORS created, enabled, and maintained a sexually hostile work environment.

114. A reasonable woman would conder that she was being treated less well that other employees under the circumstances. Plaintiff actually believed that she was being treated less well than other employees because of her gender.

115. A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

116. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

117. Defendants committed these unlawful acts with willful negligence, or reckless or a conscious disregard, of Plaintiff's right for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### Violation of NYCHRL
### Retaliation

118. All of the preceding paragraphs are realleged as if fully rewritten herein.

119. By the actions described herein, among others, Defendants violated the N.Y.C. Amin. Code Title 8-107(7) when they retaliated against Plaintiff by terminating her employment or by otherwise discriminating against her in the terms, privileges and conditions of her employment, because she opposed the unlawful discrimination and harassment from Defendant Weber.

120. As a direct and proximate result of the unlawful conduct, Plaintiff has suffered severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

121. Defendants committed these unlawful acts with willful negligence, or reckless or a conscious disregard, of Plaintiff's right for which Plaintiff is entitled to an award of punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff is entitled to and prays for the following relief:

A. A jury trial on these issues to determine liability and damages.

B. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State and City of New York;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, embarrassment, stress and anxiety, emotional pain and suffering, and any other physical or mental injuries;

E. An award of prejudgment and post judgment interest;

F. An award of punitive damages;

G. An award of liquidated/statutory damages;

H. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I. Such other legal and equitable relief as this Court deems appropriate, but in any event, not less than $75,000.

Dated: New York, New York
July 15, 2025

Respectfully submitted,

/s/ Carrie J. Dyer Elrod
Carrie J. Dyer Elrod
(*Carrie@MansellLawLLC.com*)
Greg R. Mansell
(*Greg@MansellLawLLC.com*)
**Mansell Law, LLC**
85 8th Ave., 6M
New York, NY 10011
Ph: (646) 921-8900
*Counsel for Plaintiff*

16